## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PRAIRIE BAND POTAWATOMI NATION, a federally recognized Indian tribe, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| STEPHEN DURRELL, in his official capacity as Executive Director of the Kansas Lottery, | ) ) ) ) |
| **Serve at:** 108 N. Kansas Avenue Topeka, KS 66603 | ) ) ) ) |
| Defendant. | ) ) |

Case No.:

## VERIFIED COMPLAINT

Plaintiff Prairie Band Potawatomi Nation (the "Nation") for its Complaint against Defendant Stephen Durrell, in his official capacity as Executive Director of the Kansas Lottery ("Defendant" or "Durrell"), hereby alleges as follows.

## NATURE OF THE CLAIM

### A.   Prospective injunctive and declaratory relief

1.      This is an action for prospective injunctive and declaratory relief to prohibit Stephen Durrell, in his official capacity as Executive Director of the Kansas Lottery, from continuing to offer Kansas Lottery games at locations inside the boundaries of the Nation's 900 square-mile reservation ("Reservation") in violation of federal law.

### B.    Kansas Lottery games within the Reservation

2.     Kansas currently operates lottery vending machines and licenses vendors to sell lottery tickets at approximately two dozen locations within the Reservation. Attached as **Exhibit 1** is a map of the 30-square mile by 30-square mile Reservation. Attached as **Exhibit 2** is an enlargement of a portion of the Reservation showing the Kansas Lottery locations within the Reservation with a list of the lottery locations within the Reservation.

3.     The Indian Gaming Regulatory Act, Pub. L. 100–497, 102 Stat. 2467 (1988), codified as amended at 18 U.S.C. § 1166 and 25 U.S.C. §§ 2701–2721. ("IGRA"), prohibits Class III gaming on "Indian lands" unless certain conditions are met. As discussed below, those conditions have not been met here.

4.     Lotteries, such as the Kansas Lottery, are Class III games when offered on Indian lands. 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4(d) (2002).  Under IGRA, Class III games can only be operated by recognized Indian tribes on Indian lands through a compact entered into between the tribal entity and the State on which such lands are situated.  Compacts must be approved by the Secretary of Interior pursuant to IGRA.

5.     In addition, as explained in Paragraphs 45–49 below, the Nation's federally approved gaming ordinance prohibits Kansas from offering lottery games within the Reservation. *See* Potawatomi Law and Order Code § 12-2-12 ("The Nation shall have the *sole proprietary interest in and responsibility for* the conduct of any gaming enterprise authorized by this title.") (emphasis added). *Id.* § 12-2-12.

## C.    The Reservation

6.    The 1846 Treaty with the Potawatomi Nation, June 5 & 17, 1846, 9 Stat. 853 ("1846 Treaty"), created the Reservation. As explained in greater detail below, the treaty boundaries set forth in the 1846 Treaty have never been disestablished or diminished and the area within the 1846 Treaty boundary, therefore, remains "Indian lands" under IGRA. 25 U.S.C. § 2703(4).

7.    The Nation's gaming ordinance, which dates back to 1994, defines "Reservation" in the exact same way (i.e. "'Reservation' means the Potawatomi Indian Reservation including all lands, islands, waters, roads, and bridges, or any interests therein, whether in trust or non-trust status, and notwithstanding the issuance of any patent or right-of-way, within the boundaries of Reservation as established in Article 4 of the Treaty of July 23, 1846, 9 Stat. 853 . . . ."). Potawatomi Law and Order Code § 12-2-1(NN).

8.    The Nation is the sole successor in interest to the 1846 Treaty, having remained on and occupied its treaty lands since its creation and having maintained political continuity with the Potawatomi Nation, which signed the 1846 Treaty.

## D.    Requested relief

9.    This action seeks to stop Kansas Lottery's ongoing violations of IGRA, of the Nation's gaming ordinance, and of the Nation's sovereign rights.

10.    The sale of lottery tickets within the Reservation violates IGRA because the Nation has the exclusive right to regulate gaming activity within the

3

Reservation. 25 U.S.C. § 2701(5). The Nation has not authorized the State of Kansas to sell lottery tickets within the Reservation.

11.    The sale of lottery tickets within the Reservation violates IGRA and the Nation's gaming ordinance because both require that the Nation have the sole proprietary interest in all Class III gaming activities within the Reservation. 25 U.S.C. §§ 2710(b)(2)(A), 2710(d)(1)(A)(ii), (d)(1)(C); Potawatomi Law and Order Code § 12-2-12.

12.    The sale of lottery tickets within the Reservation also violates the Nation's common law right to regulate civil matters within its Reservation as established by a long line of caselaw prior to the enactment of IGRA.

13.    For these reasons, the Nation brings this action seeking prospective injunctive and declaratory relief against Durrell as follows:

    a.    First, the Nation seeks a declaration that the 900 square-mile Reservation has never been disestablished or diminished.

    b.    Second, the Nation seeks a declaration that the Defendant is currently violating federal law by operating Kansas Lottery vending machines and authorizing retailers to sell lottery tickets within the Reservation.

    c.    Third, the Nation seeks a declaration that the Defendant is violating the Nation's laws, regulations and gaming ordinances, over which the Nation has exclusive jurisdiction to enforce by

CORE/0835793.0020/245403247.3

virtue of its civil regulatory jurisdiction over gaming activity on its Reservation.

d.    Fourth, the Nation seeks an injunction prohibiting the Defendant from operating any state lottery vending machines or licensing retailers to sell lottery tickets within the Reservation.

14.    Such relief will end the ongoing violations of federal law.

15.    On May 21, 2026, the Nation notified the Defendant of these ongoing violations of federal law. On June 15, 2026, Defendant's counsel and an attorney from the Kansas Attorney General's office met with the Nation's counsel.

16.    That meeting did not result in any resolution that would stop the lottery ticket sales within the Reservation.

17.    On June 23, 2026, the Nation again notified the Defendant (through his counsel) in writing that he must stop selling lottery tickets within the Reservation.  Defendant has not agreed to stop offering lottery ticket sales on the Reservation and those sales continue to occur.

18.    Nation officials have previously advised Kansas officials, including the Defendant, that the 1846 Treaty boundaries (shown on Exhibit 1) remain intact, including by incorporating the 1846 Reservation boundaries in the definitions of the Nation's1994 gaming ordinance. Defendant's ongoing refusal to recognize the Nation's treaty rights and its jurisdiction over the Reservation continues to violate federal law. 1846 Treaty, 9 Stat. 853.

CORE/0835793.0020/245403247.3

## PARTIES

19.     The Prairie Band Potawatomi Nation is a federally recognized Indian tribe, with governmental offices at 16281 Q Rd, Mayetta, Kansas 66509. The Nation exercises governmental authority over the Reservation and those within it by virtue of its inherent sovereignty, the treaties with the Potawatomi Nation, the Constitution of the United States, and federal statutory and common law.

20.     Stephen Durrell is the Executive Director of the Kansas Lottery, a position he has held since 2018. His office is located at the Kansas Lottery offices at 108 N. Kansas Avenue, Topeka, Kansas 66603. The Kansas Lottery is an arm of the State of Kansas.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action because the claims at issue arise under federal law, because the action is brought by a federally recognized Indian tribe, and because the Nation seeks declaratory relief. 28 U.S.C. §§ 1331, 1362, 2201.

22.     This Court has federal question jurisdiction because the Complaint alleges ongoing violations of federal law by the Defendant within the Nation's Reservation. 25 U.S.C. §§ 2701–2721.

23.     The Complaint also alleges violations of the Nation's right to regulate gaming on its own Reservation, in violation of federal common law.

24.     Under *Ex parte Young*, and its progeny, the Nation may seek, and the Court may grant, prospective injunctive and declaratory relief against Kansas

CORE/0835793.0020/245403247.3

Lottery Executive Director Stephen Durrell in his official capacity to stop ongoing violations of federal law. *See Ex parte Young* 209 U.S. 123, 155–56 (1908) ("[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."); *see also Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) ("[A] plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.") (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Notwithstanding the immunity afforded to the states under the Eleventh Amendment of the United States Constitution, the State does not have, and therefore cannot confer on its individual officers, any authority to violate federal law.

25.     This Court has federal question jurisdiction to grant prospective injunctive and declaratory relief under the Court's inherent equitable powers and under *Ex parte Young* against the Kansas Lottery Executive Director, Stephen Durrell, for conducting gaming within the Nation's Reservation in violation of federal law. *See Ex parte Young*, 209 U.S. at 155–56.

26.     This Court likewise has federal question jurisdiction to grant prospective injunctive and declaratory relief under IGRA, under the Nation's

7

CORE/0835793.0020/245403247.3

gaming ordinance, and under the Nation's common law right as a sovereign government to regulate gaming within its Reservation.

27.    This Court has personal jurisdiction over Durrell because the Kansas Lottery maintains offices in this District, does business in this District, and the acts complained of and giving rise to the claims alleged herein occurred in this District.

28.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because all parties are located within this District and the events giving rise to the Nation's claims occurred within the District.

## FACTUAL BACKGROUND

### A.    The Potawatomi Reservation

29.    The 1846 Treaty established the Nation's Reservation.  As shown in the attached map of the 1846 reservation boundaries (attached as Exhibit 1), the Reservation boundaries fall within the following present-day counties in Kansas: Jackson County, Pottawatomie County, Shawnee County, and Wabaunsee County. This Reservation pre-dated the formation of the Territory and State of Kansas and the four present-day counties in Kansas.

30.    In exchange for ceding to the United States all right, title, and interest to lands that the Nation held in the Midwest, the United States in 1846 promised the Potawatomi Nation that their new Kansas reservation "would be their land and home *forever*." 1846 Treaty, art. IV, 9 Stat. at 854 (emphasis added).

31.    Only two treaties impacting the Nation were negotiated and approved after the 1846 Treaty, the 1861 Treaty with the Pottawatomie, Nov. 15, 1861, 12

8

Stat. 1191 ("1861 Treaty") and the 1867 Treaty with the Pottawatomie,
Feb. 27, 1867, 15 Stat. 531 ("1867 Treaty"). In sharp contrast to other treaties of the
era in which the language of cession and total surrender of tribal interests was
used, neither of these treaties contained express language disestablishing or
diminishing the Reservation.

32.     In these two Potawatomi treaties executed after the establishment of
the 1846 reservation, some of the land was allotted, some of it was held in common,
and some of the land was sold as surplus land to the railroad. *See* 1861 Treaty; 1867
Treaty.

33.     But none of these concessions, without more, can be equated to a
present and total surrender of all tribal interests. Notably absent from either of
these treaties is unequivocal language in which the tribe cedes, relinquishes, or
quitclaims to the United States its right, title, and interest in all or part of the 1846
Reservation. *See* 1861 Treaty; 1867 Treaty. Accordingly, neither of the two
subsequent treaties diminished or disestablished the Reservation.

34.     Nor did any subsequent Act of Congress contain express language
disestablishing or diminishing the Reservation.

35.     The Supreme Court's 2020 decision in *McGirt v. Oklahoma*, 591
U.S. 894 (2020), controls. It made crystal clear that only Congress can disestablish
or diminish reservation boundaries, and that it can only do so by clearly expressing
its intent to do so, commonly with an explicit reference to cession or other language
evidencing the *present and total surrender* of all tribal interests. *Id.* at 904

CORE/0835793.0020/245403247.3

(emphasis added); *see also Solem v. Bartlett*, 465 U.S. 463, 470 (1984) ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.").

36.    This leaves "only one place we may look: the Acts of Congress." *McGirt*, 591 U.S. at 903. Congress knew how to disestablish or diminish a reservation when it had the intent to do so. Yet no subsequent Act of Congress has ever explicitly stated a present and unconditional intent to diminish or disestablish the 1846 Reservation.

37.    Because only Congress can disestablish or diminish reservation boundaries—and must do so by express and unambiguous language—the 1846 Treaty Reservation boundaries continue in place today.

## B.    Class III Gaming on the Reservation

38.     Having shown that the 1846 Reservation boundaries remain in place, it necessarily follows that the land within those boundaries is "Indian land" under IGRA and, therefore, the Nation has the exclusive right to regulate Class III gaming (and the sole proprietary interest in Class III gaming) within those boundaries to the exclusion of the Kansas Lottery. 25 U.S.C. §§ 2701(5), 2703(4), 2710(b)(2)(A), (d)(1)(A)(ii).

39.    "Indian lands" includes all lands within the boundaries of the Reservation. *Id.* § 2703(4) ("The term 'Indian lands' means (A) all lands within the

CORE/0835793.0020/245403247.3

limits of any Indian reservation . . . .").  And, under 18 U.S.C. § 1151, all lands within the Reservation are Indian country.

40.    Congress intended for IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), and "to provide a statutory basis for the regulation of gaming by an Indian tribe . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation. . . ." *Id.* § 2702(2).

41.    IGRA preempts Kansas' ability to offer Class III lottery games on the Reservation. 25 U.S.C. § 2701(5) ("Indian tribes have *the exclusive right* to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.") (emphasis added).

42.    Under IGRA, "'class I gaming' means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations," 25 U.S.C. § 2703(6), and "class II gaming" means bingo, "pull-tabs, lotto, punch boards, tip jars, instant bingo, and . . . other games similar to bingo," and certain card games, but not "banking card games . . . or electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." *Id.* § 2703(7).

43.    "Class III gaming" under IGRA "means *all* forms of gaming that are not class I gaming or class II gaming." *Id.* § 2703(8) (emphasis added). Lotteries are

11

Class III games. 25 C.F.R. § 502.4 ("Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to: . . . (d) Lotteries.").

44.    The lottery games offered by Kansas within the Reservation, are, therefore, Class III games under IGRA.

45.    The Nation's federally approved gaming ordinance prohibits Kansas from offering lottery games within the Reservation because only gaming owned by the Nation is permitted within the Reservation. 25 U.S.C. §§ 2710(b)(2)(A), 2710(d)(1)(A)(ii); Potawatomi Law and Order Code § 12-2-12 ("The Nation shall have the *sole proprietary interest in and responsibility for* the conduct of any gaming enterprise authorized by this title.") (emphasis added).

46.    The National Indian Gaming Commission ("NIGC") Chairman approved a gaming ordinance for the Nation on July 25, 1994. Letter from NIGC Chairman Anthony J. Hope to Tribal Chair Mamie Rupnicki (Jul. 25, 1994). That gaming ordinance defined "Reservation" as:

> the Potawatomi Indian Reservation including all lands, islands, waters, roads, and bridges or any interests therein, whether in trust or non-trust status and notwithstanding the issuance of any patent or right-of-way, within the boundaries of Reservation as established in Article 4 of the Treaty of July 23, 1846, 9 Stat. 853, and such other lands, islands, waters or any interest therein thereafter added to the Reservation at any time.

Potawatomi Law and Order Code § 12-2-1(AN) (July 14, 1994).

47.    The 1994 gaming ordinance also defined "Tribal Land" as "Any land within the limits of the Reservation of the Prairie Band of Potawatomi Indians of

12

CORE/0835793.0020/245403247.3

Kansas, together with any accretions thereto, which land must be located within the State of Kansas . . . ." *Id.* § 12-2-1(AU)(1).

48.     The 1994 gaming ordinance also stated that "The purposes of this Title are: **(A)** To regulate, control and license the operation of all gaming within the Reservation and on all other Potawatomi Indian lands as defined by 25 U.S.C. § 2703(4) . . . ." *Id.* § 12-1-8 (emphasis in original).

49.     Nothing in the subsequent amendments to the gaming ordinance (which were also approved by the NIGC Chair) limited these definitions or powers in any way.

50.     While the 1995 gaming compact between the State of Kansas and the Nation applies to only a "portion" of the Reservation, the Nation did not waive or concede any disestablishment or diminishment of its Reservation. *See, e.g.*, Gaming Compact, §§ 3(F), 5(W) (June 26, 1995) ("'Reservation' means *that portion of* the Prairie Band Potawatomi Nation in Kansas Reservation, located within the boundaries of Kansas, as shown in appendix D.") (emphasis added). The gaming compact was amended in 2023 and nothing in the amendment constituted a waiver or conceded any disestablishment or diminishment of the Reservation. Amendment to the Prairie Band Potawatomi Nation-Kansas Gaming Compact (July 11, 2023).

51.     Kansas is also prohibited from offering lottery games within the Reservation because no gaming compact has been approved by the Secretary of the Interior authorizing Class III gaming (other than sports wagering) within the Reservation. *See* Gaming Compact, §§ 3(F), 5(W), app. D (June 26, 1995, amended

CORE/0835793.0020/245403247.3

July 11, 2023) (limiting Gaming Compact's application, except for sports wagering, to an eleven mile by eleven mile portion of the Reservation on which Kansas does not currently offer or authorize any lottery games).

52.    The Nation has not adopted any ordinance or resolution to allow anyone other than the Nation to engage in Class III gaming on its Reservation.

53.    Nevertheless, the Kansas Lottery has been operating state lottery vending machines and authorizing retailers to sell lottery tickets within the boundaries of the Reservation, including at the locations shown on Exhibit 2.

54.    The Nation has informed the Defendant that such gaming is unlawful, but the Defendant continues to conduct and authorize such activities.

## C.    The Nation's civil-regulatory jurisdiction over gaming within the Reservation

55.    Under *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 204 –205, 214–222 (1987), and other controlling case law, the Nation has inherent civil-regulatory jurisdiction over lottery gaming conducted within the Reservation.

56.    The Nation regulates gaming within the Reservation through its gaming ordinance. Potawatomi Law and Order Code, Title 12.

57.    The Nation has not authorized the Defendant to conduct lottery gaming within the Reservation.

58.    Even without an effective Nation gaming ordinance, the State could not conduct gaming within the Reservation without some approval by the Nation, which the Nation has not given.

CORE/0835793.0020/245403247.3

59.    The Court has inherent equitable jurisdiction to declare the Defendant in violation of the Nation's civil-regulatory laws governing the conduct of gaming within the Reservation and to enjoin the Defendant from its ongoing violations of the Nation's laws.

**CLAIMS FOR RELIEF**
**COUNT I**
**DECLARATORY JUDGMENT**

60.    The Nation repeats and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

61.    The Nation seeks and is entitled to a declaration acknowledging that the 900 square mile Reservation as established in the 1846 Treaty has not been disestablished or diminished.

62.    Subsequent treaties never evidenced a present and total surrender of all the Nation's interests in the Reservation, and thus, the Reservation boundaries remain intact.

63.    Congress has never explicitly disestablished or diminished the Reservation, and thus, the Nation maintains authority and jurisdiction over the land within the Reservation boundary.

64.    All lands within the Reservation remain "Indian land" under IGRA.

65.    For these reasons, the Nation seeks a declaration that the Reservation has not been disestablished or diminished.

CORE/0835793.0020/245403247.3

## COUNT II
## DECLARATORY JUDGMENT

66.     The Nation repeats and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

67.     The Nation seeks and is entitled to a declaration that the Defendant is currently violating IGRA by operating Kansas Lottery vending machines and licensing retailers to sell lottery tickets within the Reservation in which the Nation has the exclusive authority to regulate gaming.

68.     The Defendant is operating state lottery vending machines and authorizing retailers to sell lottery tickets within the Reservation without a state-tribal compact authorizing the State to conduct or to authorize such activities within the Reservation.

69.     The Defendant does not share any revenue from its lottery sales within the Reservation with the Nation, as a result of which the Nation does not have the sole proprietary interest in the Defendant's on-Reservation lottery sales in violation of IGRA. 25 U.S.C. §§ 2710(b)(2)(A), (d)(1)(A)(ii).

70.     For these reasons, the Nation seeks a declaration that the State's ongoing Class III lottery gaming activity within the Reservation violates IGRA.

## COUNT III
## DECLARATORY JUDGMENT

71.     The Nation repeats and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

16

72.     The Nation seeks and is entitled to a declaration that the Defendant is currently violating the Nation's gaming ordinance, which was approved by the NIGC in 1994, by operating Kansas Lottery vending machines and licensing retailers to sell lottery tickets within the Reservation in violation of the Nation's laws, regulations and gaming ordinances, which the Nation has exclusive jurisdiction to enforce by virtue of its civil-regulatory jurisdiction over gaming activity on its Reservation.

73.     The sale of lottery tickets within the Reservation also violates the Nation's common law right as a sovereign entity to regulate civil matters within its reservation as established by a long line of caselaw prior to the enactment of IGRA.

74.     The Defendant does not share any revenue from its lottery sales within the Reservation with the Nation meaning that the Nation does not have the sole proprietary interest in the Defendant's on-Reservation lottery sales in violation of the Nation's gaming ordinance.

75.     As a result of the current ongoing operation, the Nation seeks a declaration that the State's ongoing Class III lottery gaming activity within the Reservation violates the Nation's exclusive right to regulate itself as a sovereign entity.

**COUNT IV**
**INJUNCTION**

76.     The Nation repeats and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

17

77.     The Nation is entitled to an injunction prohibiting Defendant from continuing to operate Kansas Lottery vending machines and authorizing retailers to sell lottery tickets within the Reservation.

78.     The Defendant's current operation of lottery vending machines and authorizing retailers to sell lottery tickets within the Reservation violates federal law.

79.     The Nation seeks prospective relief through an injunction prohibiting the Defendant from any future operation of the lottery vending machines and sales of lottery tickets within the Reservation unless and until the State of Kansas and Nation enter into a gaming compact authorizing such sales by the Defendant, which is approved by the NIGC Chairman.

80.     The Nation is suffering and will continue to suffer irreparable harm without injunctive relief because the Defendant continues to ignore and invalidate the Nation's sovereign rights and authority to regulate Class III gaming within its Reservation.

81.     The Defendant will not suffer any legally cognizable harm from an injunction enforcing federal law. The Nation, however, will suffer irreparable harm in the absence of an injunction.

82.     An injunction is in the public interest because compliance with federal law governing Class III gaming on Indian lands is in the public interest.

CORE/0835793.0020/245403247.3

83.    An injunction is also in the public interest because compliance with the Nation's rights as a sovereign entity to regulate itself and the economic activity within its own Reservation is in the public interest.

## REQUEST FOR PLACE OF TRIAL

The Nation hereby requests that the trial of this matter take place in Topeka, Kansas.

## RELIEF REQUESTED

**WHEREFORE**, in accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and general principles of equity, the Nation respectfully seeks:

A.    A declaration that the Nation's Reservation has not been disestablished or diminished;

B.    A declaration that the Defendant is violating federal law by operating Kansas state lottery vending machines and authorizing retailers to sell Kansas state lottery tickets within the Nation's Reservation;

C.    A declaration that the Defendant is violating the Nation's laws, regulations and gaming ordinances, which the Nation has exclusive jurisdiction to enforce by virtue of its civil regulatory jurisdiction over gaming activity on its Reservation;

D.    An injunction directing the Defendant to cease operating any Kansas state lottery vending machines and authorizing retailers to sell Kansas state lottery tickets within the Nation's Reservation unless and until

CORE/0835793.0020/245403247.3

the State of Kansas and Nation enter into a gaming compact authorizing such sales by the Defendant, which the NIGC Chairman approves;

     E.     Such further necessary or proper relief as the Court may see fit to grant in conjunction with the declaratory and injunctive relief requested herein, whether legal or equitable in nature; and

     F.     All costs and fees allowed by law.

DATED:     July 6, 2026

Respectfully submitted,
**STINSON LLP**

*s/ Jere D. Sellers*
Jere D. Sellers     KS #16405
Rachel E. North     D. Kan. #79121
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Tel: (816) 691-3190
Fax: (816) 412-8195
Email: jere.sellers@stinson.com
     rachel.north@stinson.com

**LIPPES MATHIAS LLP**

Carol E. Heckman
*Pro hac vice pending*
NY State Bar #1321561
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
Tel: (716) 853-5100
Fax: (716) 853-5199
Email: checkman@lippes.com

**LIPPES MATHIAS LLP**

Klint A. Cowan
*Pro hac vice pending*
OK State Bar #20187
512 NW 12th Street
Oklahoma City, OK 73103
Tel: (405) 204-6487
Fax: (202) 888-7615
Email: kcowan@lippes.com

*Attorneys for Plaintiff*

20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| PRAIRIE BAND POTAWATOMI NATION, a federally recognized Indian tribe, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: ) ) |
| STEPHEN DURRELL, in his official capacity as Executive Director of the Kansas Lottery, | ) ) ) ) |
| Defendant. | ) ) ) |

### VERIFICATION

Joseph "Zeke" Rupnick, being duly sworn, deposes and says that I am the Chairman of the Prairie Band Potawatomi Nation, the Plaintiff in the above-entitled action. I have reviewed the allegations in the foregoing Complaint and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on statements from other Nation officials and believe them to be true.

_____
Joseph "Zeke" Rupnick, Chairman
Prairie Band Potawatomi Nation

Sworn to before me this 2nd
day of July 2026.



_____
Notary Public

NOTARY PUBLIC, State of Kansas
COSETTE WAHWASSUCK
My Appt. Exp. 6/3/29